The READ CORPORATION and F.T. Read & Sons, Inc., Plaintiffs,

v.

PORTEC, INC., d/b/a Portec/Kolberg Division, Defendant.

Civ. A. No. 88–29–JRR.

United States District Court, D. Delaware.

Oct. 23, 1990.

Donald F. Parsons, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Jack R. Pirozzolo, and Richard L. Binder, of Willcox, Pirozzolo & McCarthy, Boston, Mass., of counsel), for plaintiffs.

Januar D. Bove, Jr., and Jeffrey B. Bove, of Connolly, Bove, Lodge & Hutz, Wilmington, Del. (Donald R. Dunner, and Barry W. Graham, of Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., of counsel), for defendant.

## OPINION

ROTH, District Judge.

The Read Corporation and F.T. Read & Sons, Inc. ("Read") brought this action, charging willful infringement by defendant Portec, Inc. ("Portec") of two patents: United States Patent 4,197,194 ("the '194 patent") and United States Design Patent 263,836 ("the '836 patent"). Plaintiff F.T. Read & Sons, Inc., is the assignee of the two patents, and plaintiff F.T. Read Corporation is the licensee of the patents. James Read is the principal of the plaintiff companies and the inventor of both patents.

These patents cover a screening device for separating fine earth material from coarser materials. Portec is accused of producing and marketing a series of screening devices that infringed the '194 and '836 patents. The case was tried to a jury. On March 16, 1990, the jury returned a verdict of willful infringement by Portec of both patents and awarded plaintiffs $1,324,782 in compensatory damages for lost profits. Plaintiffs then filed a motion for an award of treble damages, attorneys' fees, and expenses pursuant to 35 U.S.C. §§ 284 and 285. We granted that motion on May 25, 1990.

Presently before the Court is Portec's motion for judgment not withstanding the verdict ("JNOV"), pursuant to Federal Rule of Civil Procedure 50, or, in the alternative, for a new trial pursuant to Rule 59. In its motion, Portec challenges the jury verdict as well as a number of Court rulings made in the course of the trial.

Portec bases its JNOV motion on the ground that there was no substantial evidence presented at trial to support the following verdicts: (1) that each accused Portec screening device infringes one or both of independent claims two and seven of the '194 patent and these patent claims were not invalid on the grounds of anticipation or obviousness; (2) that each accused Portec screening device infringes the '836 design patent and the '836 patent was not invalid; (3) that Portec's infringement was willful;[1] and (4) that the jury verdict, awarding damages for lost profits in the amount of $1,324,782, was not supported by substantial evidence of the unavailability of acceptable non-infringing substitutes.

---

1. Similarly, Portec contends that this Court's findings in the May 25, 1990, decision granting plaintiffs' motion for treble damages, attorneys' fees and expenses were erroneous. Portec requests the Court to reconsider its ruling on plaintiffs' motion for treble damages, attorneys' fees and expenses as part of the present motion.

In its alternative motion for a new trial, Portec contends that the jury verdict was clearly contrary to the weight of the evidence and that a miscarriage of justice will result if the verdict is permitted to stand. In this motion, Portec also challenges the following rulings by the Court: (1) the Court's denial of defendant's request to present surrebuttal evidence on a screening device referred to as the "Hoehn" device; (2) the Court's decision to exclude evidence concerning two other patents owned by plaintiffs, United States Patent 4,237,000 ("the '000 patent") for a center plate used in the plaintiffs' screening device, and United States Patent 4,256,572 ("the '572 patent") for an optional conveyor for use with the plaintiffs' screening device; (3) the Court's rejection of Portec's proposed jury instruction number 18 and the Court's alleged failure to adequately instruct the jury on the correct meaning and interpretation of critical elements in claims 2 and 7 of the '194 patent in light of the prosecution history of those claims; and (4) the Court's rejection of defendant's proposed jury instruction number 36 concerning damages for lost profits.

These arguments will be addressed in turn. For the reasons discussed below, we will deny Portec's motions on each of these grounds.

The principles which guide a court in considering motions for JNOV or for a new trial have been described as follows:

Jury verdicts must be treated with great deference. The Seventh Amendment to the Constitution preserves the right to trial by jury in suits at common law and also provides that United States Courts shall not re-examine facts tried by jury except under the rules of common law. With the merger of law and equity, denial of the right in certain types of cases ceased. Permitting the jury to draw legal conclusions based on the jury's fact findings and reached in light of instructions on the law has been preserved as part of the right. The court, though it remains ultimately responsible for upholding the law applicable to the facts found, cannot substitute its view for that of the jury when to do

so would be an effective denial of the right to trial by jury.

*Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546 (Fed.Cir.1983). Thus, a court must follow the following standard in deciding a motion for JNOV:

[A] court must: (1) consider all the evidence; (2) in a light most favorable to the nonmover; (3) drawing reasonable inferences favorable to the non-mover; (4) without determining the credibility of the witnesses; and (5) without substituting its choice for that of the jury between conflicting elements in the evidence. The court should not be guided by its view of which side has the better case or by what it would have done had it been serving on the jury. If, after following those guidelines, the court is convinced upon the record before the jury that reasonable persons could not reach or could not have reached a verdict for the non-mover, it should grant the motion for directed verdict or for JNOV.

*Id.; accord Senmed, Inc. v. Richard–Allan Medical Indus.*, 888 F.2d 815, 817 (Fed. Cir.1989) (to prevail in motions for JNOV or new trial, defendant "must show that the jury's finding of infringement is not supported by substantial evidence or that it was made in relation to a claim interpretation that cannot in law be sustained"); *Neville Chem. Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.) (motion for JNOV "may not be granted unless as a matter of law it is found that [the plaintiff] failed to present a case to the jury, and a verdict in [the defendant's] favor should have been directed at the end of the trial"), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

The standard for deciding a motion for new trial is as follows: "Motions for a new trial require the exercise of discretion by the Court, whose 'duty is essentially to see that there is no miscarriage of justice.' The jury's verdict may be set aside only if manifest injustice will result if it were allowed to stand." *Douglas W. Randall, Inc. v. AFA Protective Sys.*, 516 F.Supp. 1122, 1124 (E.D.Pa.1981) (citations omitted), *aff'd*, 688 F.2d 820 (3d Cir.1982); *accord*

*Railroad Dynamics, Inc. v. A. Stucki Co.,* 579 F.Supp. 353, 358 (E.D.Pa.1983), *aff'd,* 727 F.2d 1506 (Fed.Cir.) *cert. denied* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

## I. FACTUAL BACKGROUND

Keeping these standards in mind, we will then turn to the facts of this case as they were presented to the jury. This action involves the scope of the claims in the '194 patent (Defendant's Trial Exhibit ("DX") 20) and of the claim and illustrations of the design exhibited in the '836 patent (DX 21). The subject of these patent claims is a device (or "plant" or "apparatus") for screening and separating different sizes and types of earth materials. The materials which can be screened and separated by such a device include sand, loam, stones, tree stumps and construction debris. The device is sufficiently portable to be towed on the highway behind another vehicle. It is designed to permit a front-end payloader tractor to dump material on top of the screening plant and to scoop out the screened material from its interior.

Read developed the concept for these two patents over a long period during which he worked as an excavating and earth moving contractor. His work, and the particular field in which the patented device is utilized, involves the excavation of sites and processing of the raw material that is dug up in such excavations. (Trial Transcript (Docket Items 325–325Q) ("Tr.") at 190–93). The raw earth and associated debris excavated at a site can be screened and separated into fine-grade through rough-grade materials. These separated materials can then be employed for the purpose which fits their size and composition. Fine earth can be screened and used as top soil, while rough stones and boulders can be sorted out and used as heavy filling material. Tree stumps and other debris can be discarded. (Tr. at 193–98).

Working as an excavator, Read gained extensive familiarity with a variety of available screening devices and with the operation of earth moving equipment, such as front-end payloader tractors, used in conjunction with those screening devices. He employed different types of screening equipment in what has traditionally been a two-step process to screen and separate excavated materials.

The first step in this process involves the simplest type of screening device, referred to as a "grizzly." A grizzly consists of a sloping screen of parallel steel bars on to which heavy debris is dumped. The largest objects, such as boulders and tree stumps, will roll off the screen while the smaller debris will fall through it onto the ground. Such a grizzly may also be part of a screening apparatus which will perform the next step in the screening process.

The next step is to feed the materials, which pass through a grizzly screen, onto another type of screening device referred to as a "dinosaur." A dinosaur usually consists of a large receptacle called a "hopper" at one end, a long conveyor belt and chute assembly, and a number of small screens. The raw material is dumped into the hopper. The largest objects are separated out there, and the remaining material then travels up a conveyor and chute assembly and is deposited onto one or more shaker screens at the upper end of that assembly. Piles of different grades of coarseness build up from the materials that fall through the screens or off the end of the conveyor. There is no barrier between these accumulating piles, and they tend to blend into one another as more material is deposited. (Tr. 190–205, 234–44, 253–54, 345–54, 854–57).

Read found that these grizzly and dinosaur devices suffered from a number of deficiencies. They were unwieldy, difficult to move around, and frequently malfunctioned because of the number of moving parts and the stress placed on belts and pulleys throughout the assembly. Due to their size and shape, they were awkward either to transport on a trailer or to tow on wheels attached to the frame of the device. A number of workers were needed to operate them, because of their configuration and the frequency with which materials clogged in different parts of the assembly. (Tr. at 198–205, 212–16, 295–99, 416–17).

Read began to design a new type of screening plant that would combine the functions of a grizzly and dinosaur in a single device that could be operated and transported with greater ease and efficiency. (Tr. at 205–12, 273–74). The size and operation of a front-end payloader tractor was the determinative factor in Read's design. He wanted to create a screening plant onto which one could dump debris from the payloader "bucket" (the shovel-edged container with which material is scooped up by a payloader tractor). The same tractor would then scoop the finer material out from the interior of the screening plant, without having to move the screening plant out of the way of the tractor. Read wanted the design of his screening device to accommodate the dimensions of typical front-end payloader tractors. Read envisaged a screening plant that could be transported, set-up, and operated by a single person, using a payloader. (Tr. at 274–78).

The dimensions of the screening plant were dictated by the width of payloader buckets and the height to which the payloader buckets could be raised by the tractor and dumped out while in such a raised position. Read designed the two opposing "ends" of his screening plant to accommodate these measurements of payloader tractors. (See Appendix)

Read created a rectangular screening plant with a wheel assembly on one "side" and a hitch assembly on the opposing "side." He referred to the other two longer sides as the "tall end" and "short end" of the screening plant. A shaker screen was located within the rectangle of the frame, with a downward slope from the tall end of the plant to the opposing short end.[2] The shaker screen sloped down in order to facilitate the screening process.

Read designed the tall end of the screening plant so that a payloader could raise up its bucket, filled with unprocessed material, and dump that material over the tall end onto the shaker screen. The finer material would fall through the shaker screen into the interior of the screening plant. The coarse material that did not fall through the shaker screen would cascade down the slope of the screen and fall off its edge, piling up on the outside of the short end.

To enable an operator to scoop the finer material out of the interior of the screening plant with the same payloader tractor that was used to dump the unprocessed material onto the shaker screen, Read designed the tall end to be completely open. No supporting structure existed at the tall end. That end of the screening plant was unobstructed so that the bucket of a payloader tractor could be inserted. As designed then, the screening plant had three enclosed sides: one side on which the wheel assembly was located, the opposing side on which the hitch was located, and the short end. The tall end was open up to the edge of the shaker screen.

The short end, described as "closed to the ground" in the claims, served three functions. First, enclosing the short end provided a barrier against which the payloader could scoop material from the interior of the screening plant. The short end also provided a dividing wall between the finer material which fell into the interior of the screening plant and the coarser material which cascaded off the outside. This coarse material could be scooped up with the payloader to be dumped over the shaker screen again, moved to another area of the excavation site, or loaded into a truck and carried away. Similarly, the finer material which fell through to the interior of the screening plant could be scooped out by the payloader to be deposited in another area at the excavation site or loaded into a truck. In addition, the enclosing of the short end added sturdiness to the frame. With the tall end completely open, the closed structure of the short end was nec-

2. The "length" of a sloped screen through which material is sifted was traditionally designated as that distance between the upper edge on which coarse material is deposited and the opposite edge toward which the material cascades. In Read's design, the sloped screen was placed sideways relative to the hitch and wheels. Therefore, he refers to what would otherwise be called the hitch and wheel "ends" as the "sides." His terms are oriented to the position of the screen, and not to the position of the hitch and wheels for towing.

essary to hold the two sides together and prevent them from bending out when the screening plant was in operation.

In order to design a screening plant, which fit the dimensions of a payloader tractor and was easily towed on the highway, Read designed his shaker screen in a manner dramatically different from traditional dinosaur and grizzly screening devices. The screen of a dinosaur or grizzly was usually two and one half times as long as it was wide.[3] Such devices were not easily operated in conjunction with a payloader tractor. A payloader tractor could not reach under such a long screen to retrieve the processed material, unless the screen was placed at such a sharp slope that the tall end of the screen would then be too high for the payloader bucket to reach over to deposit material onto the screen. Because of their dimensions, the traditional long screen devices had to be used with unwieldly conveyor and chute assemblies.

Read designed his shaker screen to have a width equal to or greater than its length. Such a shaker screen would then fit a screening plant designed to accommodate a payloader bucket. Moreover, the dimensions of the screening plant would allow it to be towed on the highway without the need for special permits. This design also made it possible to hitch the screening plant directly to the towing vehicle. Dinosaurs and grizzlies, on the other hand, were either towed on flat-bed trailers or with wheel and hitch assemblies that were cumbersome in comparison to Read's design. In addition, because of the height and width of dinosaurs and grizzlies, they required a special permit if they were to be towed on the highway.

To perform the heavy screening functions of a grizzly, as well as the finer screening functions of a dinosaur, the Read device had to be stable and durable when in operation. Read designed a rectangular frame and wheel assembly which permitted the wheels to be positioned below the frame for transport but would then transfer the weight of the plant from the wheels to the frame, resting on the ground, when the screening plant was placed in operation. (Tr. at 274–88, 298–99, 303–18, 331–38). Read located the wheels and hitch on the sides of his screening plant rather than along either the tall or short ends where they would interfere with the operation of the payloader tractor.

Read's development of the design of his device progressed through 1977 and early 1978. He built the first working model in mid–1978. (Tr. 534–36). On October 2, 1978, Read filed his application for a patent that would be issued as the '194 patent. (DX 7).[4] The original application contained four independent claims and six dependent claims for a screening device and one claim for a method of screening. The "specification" described the details and advantages of Read's invention and distinguished it from the prior art. Although the Examiner of the United States Patent and Trademark Office ("PTO"), who handled Read's application, required Read to amend the claims in that application, the original specification was retained throughout and was included in the '194 patent. (DX 7 at 3–12; DX 20, cols. 1–6).

The specification observed that "[a]s a rule of thumb" the prior art required that the "downwardly sloping length of the shaker screen should be about two and a half times the width of the screen," and that this approach usually required "hoppers at the input end of the shaker screen to funnel the particles onto the screen" and "[o]ne or more output chutes or conveyors." (DX 7 at 4; DX 20, col. 1, lines 13–23). The specification observed the desirability of transporting the screening equipment to the excavation site and observed that the prior art involved inefficient methods of transport.

---

**3.** *See supra* note 2 (describing length dimension of screens).

**4.** Defendant's Trial Exhibit 7 is a certified copy of the patent application file, often referred to as the "file wrapper," for the '194 patent. For ease of reference, defense counsel numbered the lower right hand corner of the pages of this file. In our citations to this exhibit, we will refer to defendant's page numbers.

The specification described the objectives of the invention as follows:

> An object of the present invention is to provide a shaker screen separator for separating loam from exceptionally coarse material, that separator being portable for easy transport to the most remote regions.
>
> A further object of this invention is to provide such a separator which is of exceptionally simple construction, not requiring the use of hoppers, chutes or conveyors.
>
> Yet another object of this invention is to provide such a separator which is exceptionally durable even when used to separate the loam from heavy and bulky materials such as tree stumps and large rocks.

(DX 7 at 5; DX 20, col. 1, lines 44–55). In the "abstract" of what the patent discloses, Read described the type of device that could satisfy these objectives:

> A portable loam screening apparatus includes a nearly-square sloping shaker screen supported by a box-like frame. The frame has a tall end and a short end joined by two sides. Funneling surfaces directed toward the screen are provided along the upper edges of the tall end and the sides. The short end is closed to provide a wall between separated loam and coarse material. A mixture of loam and coarse material is dumped onto the shaker screen from the shovel of an excavating vehicle. The coarse material falls from the lower end of the shaker screen outside of the frame, and the loam passes through the shaker screen to within the box-like frame. The separated loam falls down a sloping table within the frame and then can be retrieved by an excavating vehicle through the open tall end of the frame. A set of wheels mounted to one side of the frame is movable relative to the frame from an operative position for transporting the apparatus to an inoperative position for resting the frame flush on the ground. A trailer hitch is mounted to the other

side of the frame and the shaker power source is mounted above the hitch.

(DX 7 at 3; DX 20).

In a description of a preferred embodiment of the invention, the specification described the relationship of the dimensions of the screening plant to its operation by a single man, using a payloader, and the advantage these proportions lent to Read's invention. (DX 20, col. 4, lines 13–68, col. 5, lines 1–5).

Read's original application included a listing of patent claims one through eleven, with claims one, two, nine, and ten as independent claims concerning the screening apparatus. Claim two, which plaintiffs viewed to be the only truly independent claim, stated the following:

> 2. A portable loam screening apparatus for separating loam from coarse material comprising:
>
> a frame of generally rectangular cross section and having a tall end and a short end joined by sides, said short end being closed and said tall end being open; and
>
> a loam separating shaker screen sloping downwardly from near the upper edge of said tall end to the upper edge of said short end, the downwardly sloping length of said shaker screen being about the same as the width of said screen.

(DX 7 at 13).

The Examiner of the PTO who handled Read's application found the original claims of that application overly broad and undefined. The Examiner determined that the claims did not define the purpose and particular geometry of the screening device in relationship to the use of a payloader tractor or in relationship to the transportability of the device by towing on the highway. In an Office Action dated February 12, 1979, the Examiner rejected all eleven claims as obvious in view of particular items of prior art. (DX 7 at 22). These prior art patent references were referred to as Haffner, Deister, Strube, Clark, Ball, Drinkwater and a French patent, Marcoux. (DX 7 at 23, 25; Plaintiffs' Trial Exhibits ("PX") 3–9A).

The Examiner observed that the Haffner reference (see Appendix) showed a portable

screening apparatus with a vibrating screen, short front end, trailer hitch and wheels. He remarked that whether the short end was extended completely to the ground was a matter of choice, because the separated materials would remain relatively separated anyway. He noted that the wall of the hopper in the Haffner reference rendered obvious the sloping table claimed in Read's claims eight, nine and ten. (DX 7 at 23).

The Examiner commented that the Deister reference (see Appendix) showed a portable vibrating screen which was on wheels and had funneling surfaces above the screen. The Strube reference (see Appendix) included a vibrating screen and was cited by the Examiner as supporting his observation that it would be obvious to one skilled in the art that the short end of such a device could be closed. He referred to the Marcoux patent (see Appendix) as demonstrating the use of wheels for transport by affixing them to the short end of an apparatus such as Haffner. The Marcoux reference also showed a table similar to that claimed by Read. The Examiner cited the Clark reference (see Appendix) for displaying a payloader and observed that "[n]o patentable significance is seen if the material is scooped from underneath a screen whether or not partially enclosed and dumping material on top of the screen." (DX 7 at 23).

On March 21, 1979, Read filed an amendment to his application in response to the Examiner's February 12 Office Action. (DX 7 at 27–39). Read amended his original independent claims one, two, nine and ten to add the following language: "a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground," and "a trailer hitch mounted to the other of said sides." The amendment also added language to the independent claims to describe the short end and tall end as "said short end being closed and the lower portion of said tall end being completely open

to a substantial height." The amendment also deleted original claims three, four and eleven.[5] (DX 7 at 27–30).

Read's patent attorney argued in remarks accompanying the proposed amendment that the Examiner had not appreciated the unique advantages of Read's invention over the prior art or the relationship of the device's dimensions to the use of a payloader. On April 17, 1979, the Examiner conducted a telephone interview with Read's patent attorney and recorded the results of his discussions in an Examiner Interview Summary Record. The Examiner summarized the outcome of his interview as follows:

It was agreed that the addition of limitations more particularly pointing out the relationship of the width and height of the tall end portion of the frame to a payloader and the location of where the short end's "closed" characteristics begin and end would define over the prior art of record, as recited in the amendments proposed by the Examiner. See Examiner's amendment.

(DX 7 at 41).

On May 9, 1979, independent claims one, two, nine and ten were revised by the Examiner's amendment. These claims were amended to read that the short end was closed "from an upper edge of said short end to the ground." The claims were also amended to state that the tall end of the device is "completely open from the ground to a height sufficiently high to permit a payloader to collect the loam from within the frame." In addition, the claims were amended to state, as to the frame of the device, that "said frame at said tall end having a width sufficient to accommodate the shovel of a payloader." Finally, original claims five through ten were renumbered respectively as claims three through eight. (DX 7 at 43–44). With further minor amendments concerning the use of the word "loam" in certain claims (DX 7 at 45–60), all eight remaining claims, with independent claims two and seven, were approved by the Examiner and the '194 patent was issued on April 8, 1980. (DX 20).

5. Claim eleven was the method of screening claim.

The original specification was retained throughout the examination process and included in the '194 patent. Claim two of the '194 patent is the primary independent claim at issue in this litigation. It reads as follows:

2. A portable screening apparatus for separating coarse material from finer material comprising:

a frame of generally rectangular cross section and having a tall end and a short end join[ed] by sides, said short end being closed from an upper edge of said short end to the ground and the lower portion of said tall end being completely open from the ground to a height sufficiently high to permit a payloader to collect the finer material from within the frame;

said frame at said tall end having a width sufficient to accommodate the shovel of a payloader;

a material separating shaker screen sloping downwardly from near the upper edge of said tall end to near the upper edge of said short end;

a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground; and

a trailer hitch mounted to the other said sides.

(DX 20, col. 5, lines 48–68).[6]

On October 11, 1979, Read filed his application for a design patent on his invention. (DX 8). The design patent was approved and issued on April 13, 1982, as the '836 patent. (DX 21). The '836 patent sets forth a series of figures depicting an embodiment of Read's screening plant design [7] and includes a single claim which states: "[t]he ornamental design for a portable screening plant, as shown and described." (DX 8).

Read began to market his patented screening plant under the product name "Screen–All." The Screen–All was produced and marketed in four sizes, each size designed to match the dimensions of a different payloader bucket size. The two best selling models were the "RD–40" and "RD–90," which were designed respectively for use with a three-yard payloader and a five-yard payloader. Initial sales were slow; approximately 6 units were sold in 1979, 16 units in 1980, 14 units in 1981, 16 units in 1982, and 14 units in 1983. However, in 1984 sales increased dramatically. 36 units were sold that year. (Tr. at 567).

Portec, the defendant in this action, was a leading manufacturer of dinosaur-type screening plants. By 1984, representatives of Portec became aware of the growing popularity of Read's Screen–All and began a course of conduct that resulted in this litigation. Donald Anderson, General Manager of Portec's Kolberg Division, had observed that the Screen–All had a notably different configuration than that of other screening devices on the market. He suggested to Ralph Kindl, Senior Executive Vice President of Portec's Construction Equipment Group, that Portec explore the possibility of acquiring Read's business operations. Kindl, with the assistance of Nancy Dedert, a Vice President of Business Planning for Portec, conducted an acquisition study of the Read companies and their business operations. Kindl and Dedert reviewed Dun & Bradstreet reports on the Read companies, Read product literature, and information from interviews with distributors familiar with Read's devices. (Tr. at 1316–22, 1385–86, 1437, 1536–42).

On December 5 and 6, 1984, Kindl and Dedert traveled to West Bridgewater, Massachusetts, to visit Read at his place of business and to discuss his operations and the possibility of an acquisition by Portec.

(DX 20, col. 6, lines 28–29)

---

**6.** Claim seven, the other independent claim at issue here, differs from claim two only in the addition of the following element as the fifth element of the claim:

a table within said frame, said table sloping downwardly from said short end toward said tall end;

**7.** Two of these figures are shown in the Appendix.

Although neither party insisted that a express agreement of confidentiality be executed, Read disclosed information about his screening plant design, financial statements, manufacturing costs, materials suppliers, pricing, and profit margins. The type of information he provided is often treated as confidential. Read intended that the information be used by Portec solely for the purpose of evaluating whether Portec would acquire Read's business.[8] (Tr. at 384–89, 1330–32, 1335–40, 1498–1505, 1511–15, 1522–23).

Kindl believed that a nationwide market potential existed for the Read screening device. Kindl and Dedert recommended to the Chairman of the Board of Portec that the company either acquire Read's business or develop its own version of Read's screening device. (PX 88). Read proposed an acquisition price of $7,000,000, which Portec considered excessive. (Tr. at 1338–39, 1536–45). Portec decided sometime during December 1984 or January 1985 not to proceed with an acquisition of Read's business. (Tr. 1360–61, 1548–50; PX 89). In early January 1985, Kindl obtained more information from Read on costs, sales volume and profits. (Tr. at 1355–57; PX 92, 93). Kindl made detailed calculations, comparing the profitability of the Screen–All with Portec's existing devices, and transmitted this information to Anderson.

Read's Screen–All sales continued to grow dramatically from 1985 onward. With increasing sales, Read enlarged its production capacity, expanded the geographic area of sales, and opened a sales office in California to handle the West Coast market. Read sold approximately 90 units in 1985, 245 units in 1986, 384 units in 1987, and 498 units in 1988. (Tr. at 567).

The commercial success of the Screen–All was observed by Portec's employees and distributors. Between November 1986 and January 1987, Portec employees, including Robert Eddy, a Portec sales manager, learned from Portec distributors that Portec was losing customers to Read. The distributors were requesting that Portec provide a product similar to the Read Screen–All. Some Portec distributors started selling the Screen–All in addition to Portec machines.

In December 1984 and January 1985, while Portec representatives had been weighing the desirability of acquiring the Read companies, Portec also began to consider whether it could produce its own version of the Screen–All. On December 19, 1984, Portec's director of corporate engineering reviewed the Read patents and any Portec devices that could constitute prior art relative to those patents. He concluded that "the configuration design seems to be troublesome" because "[t]he doctrine of equivalents could hamper our efforts" to produce a Portec version of the Read device. (Tr. at 1546–47).

On December 21, 1984, Portec requested its outside patent attorney, Emory L. Groff, Jr., of Bethesda, Maryland, to review the Read patents. (Tr. at 1342–44, 1545–47). Groff sent an opinion letter to Portec dated January 7, 1984 (DX 169), which advised Portec that it could not likely produce a device competitive with the Read device without either committing patent infringement or, to avoid infringement, producing a device that would be functionally inferior to the Read device and which therefore would not compete effectively. Noting that the '194 patent contained two claim limitations concerning the set of wheels on the screening device and the relationship of the short end of the device to the ground, Mr. Groff advised that "[a]s a general rule, if an essential element recited in a claim is entirely absent from a similar device, infringement does not exist." However, he cautioned in the letter that:

> Generally speaking, the fundamental question usually involved in determining infringement is whether there is substantial identity or equivalency between the device alleged to be infringed and the embodiment of the claimed invention dis-

---

**8.** As noted in Footnote 11, *infra*, plaintiffs' state law claim, based on unfair competition, was dismissed before trial because it had not been pled with particularity and because defendant had not received adequate notice of the nature of the claim.

closed in the patent. Even though a particular device falls outside the literal language of the claim, infringement may exist if the accused device and the patented device performs substantially the same function in substantially the same way to accomplish substantially the same result. This is referred to as the doctrine of equivalents.

(DX 169, at 2). Mr. Groff concluded that although he believed the claims of the patent could be circumvented, he doubted whether the result would be "as efficient and commercially appealing" as the patented device.

On November 20, 1986, Kindl sent a memorandum to James Horton, general counsel for Portec, reminding him of the acquisition study Portec had made of the Read business and proposing that something be done about the Read Screen–All. (PX 94). Kindl requested that Brett A. Valiquet, an outside patent attorney with the law firm of Hill, Van Santen, Steadman & Simpson, of Chicago, Illinois, provide an opinion on how Portec "can design around these patents" for the Read device. (Tr. 1361–63). In requesting this opinion, Portec did not inform Valiquet of the earlier Groff opinion.

Valiquet met with Gerald Dahlinger, a chief engineer for Portec, during January and February 1987 to discuss the Read patents and ways to produce a Portec version of the Read Screen–All without infringing those patents. When Dahlinger first consulted with Valiquet, Portec had already decided to proceed with development of a device similar to the patented device. (Tr. 2945–46). In a letter dated February 9, 1987 (DX 207), Valiquet expressed his preliminary opinion that a non-infringing device could be produced if it were designed with technical differences focused on what he perceived to be two claim limitations in the '194 patent.

Eddy wrote a memorandum entitled "Screen–All Development," in which he observed that Read's device was cutting into Portec's sales and that he believed a lucrative market existed for a Portec version of the Screen–All. (PX 112). Eddy recom-

mended that Portec develop its own version of the Read RD–40, RD–90 and RD–150, because those models were the ones most frequently requested. He stated that it was urgent to develop a Portec version of the Screen–All because "Read has developed the market for this product and at present has no competition." (PX 112).

Portec designed and produced the infringing device with remarkable speed. On September 1, 1987, Portec provided Richard Lewison, an engineer hired specifically for the purpose of designing a Portec version of the Read Screen–All (PX 116–120), with copies of the '194 and '836 patents, a videotape of the Read Screen–All in operation, and photographs of the Read device. Lewison quickly produced initial drawings of a Portec version of the Read device. These drawings were delivered to Valiquet on approximately September 16, 1987. Portec's internal documents concerning this project, including memoranda, expense vouchers and a sales representative's notes, referred explicitly to the Portec device as Portec's version of the "Read Screen–All." (PX 105, 112, 120, 141).

Based on the initial engineering drawings by Portec and an examination of the patents in issue, Valiquet sent an opinion letter to Portec, dated September 25, 1987 (DX 234), counselling that Portec could design around the '194 patent if it made certain technical differences in its design of a competing device. He believed these design differences would avoid infringement due to claim limitations resulting from the prosecution history of the '194 patent.

Valiquet performed no specific legal research for this opinion letter but based it on his general familiarity with patent law. Valiquet's opinion letter differed from the opinion of Groff due to Valiquet's omission of any direct consideration of the doctrine of equivalents. Valiquet's September 25, 1987, opinion letter stated:

... Portec does not have a short end [of its screening device] closed from an upper edge to the ground. Rather, Portec's short end terminates at a point substantially spaced from the ground....

....

Finally, all the independent claims call for wheels which are movable relative to the frame so that the frame can be moved from an operative position for transporting to an inoperative position for resting the frame flush on the ground. As noted previously, Portec has a completely different structure wherein the frame is spaced from the ground and the wheels are not movable.

During the prosecution before the U.S. patent office, Read was required by the patent office to add the limitation to his claims that the short end extends to the ground. Also, Read voluntarily added to his patent claims the concept of moving the frame so that it could be flush on the ground through use of movable wheels. Since these distinctions were added in view of prior art cited by the Examiner, Read cannot argue that Portec has any type of equivalent structure.

(DX 234, at 3). When read in the context of the surrounding events, this discussion of a lack of "equivalent structure" does not alert Portec to the dangers of the doctrine of equivalents, which focuses on whether every element of the accused device performs substantially the same function in substantially the same way as every element in the patent claims. Rather, this discussion by Valiquet is part of an opinion on how to create two specific structural differences in the hope of not literally infringing the scope of the patent claims. In contrast, Groff's warning to Portec of the applicability of the doctrine of equivalents, quoted above, alerted Portec to the importance of that doctrine.

Valiquet had expressed an opinion in February 1987 that to avoid infringement the short end of the Portec device would have to be completely open from the ground. (PX 95, 109, 110). Yet, his September 25, 1987, opinion letter found that Portec's design would not infringe the patented design when the short end of the Portec device merely "terminates at a point substantially spaced from the ground." (DX 234, at 3). Portec was thus confronted with inconsistencies not only between the opinions of Valiquet and Groff but also between Valiquet's own opinions of February and September 1987.

It is also notable that in his September 25, 1987, opinion letter, Valiquet observed that the short end of the proposed Portec version of the Screen–All would perform the same function as the short end described in the '194 patent. He stated that "as the debris builds up at the short end [of the Portec device], it creates a natural barrier preventing further debris from passing under the machine." (DX 234, at 2). Yet, nothing in this opinion letter alerted Portec to the fact that this observation might point to similarity of function with a claim element designed to serve such a purpose.

On October 22, 1987, Eddy sent Valiquet sketches and drawings of what Eddy called "our version of the Read Screen–All." At the same time Portec released the drawings to its production department so that manufacture could begin. In addition, to assist in manufacturing the Portec version, Portec employees had observed and measured a Read Screen–All in operation. Eddy had also requested that a Portec distributor in Idaho measure the dimensions of a Screen–All at his sales location. (PX 165). Valiquet responded to Eddy in a letter, dated November 25, 1987, that the final design as reflected in the drawings was "essentially the same as the drawings" that Lewison had sent to Valiquet on September 16, 1987. (DX 244).

On October 26, 1987, Clark Mola, a Portec salesman, recorded the first customer order for the Portec version of the Read Screen–All, which Mola and the distributor referred to as the "Screen–All Model 90." In January, 1988, Portec displayed its version of the Read device at a trade show in Houston, Texas. It was here that Read became aware of Portec's activities and as a result commenced the present litigation for patent infringement. (Tr. at 417–21, 874–77).

During the pendency of this litigation, Portec modified its screening devices. It changed the shape of the funneling surface (or hopper) and the shape and dimensions of the enclosures over the engine and wheel assemblies. Portec's trial counsel

characterized these changes as a litigation strategy directed toward the '836 design patent. As discussed in greater detail below, Portec also began to produce a model with only one "footpad," located on the hitch side of the device.

Portec has produced and marketed several models of its version of the Read Screen–All. These models were referred to during the litigation as follows: the Recovery I unit, with sloped hopper and two footpads;[9] the Recovery I unit, with square hopper and two footpads; the Recovery KR–8 unit, with square hopper and two footpads; the Recovery KR–10 unit, with square hopper and one footpad; the Recovery KR–8 unit, with square hopper and one footpad; the Recovery KS–10 unit, with square hopper, one footpad, and new wheel and engine enclosures; and the recovery KS–8 unit, with square hopper, one footpad, and new wheel and engine enclosures. (Tr. at 185–86; PX 275–278, 288).[10]

The original complaint in this action charged infringement of four patents: the '194 patent, the '836 design patent, the '000 patent for a center plate used in the plaintiffs' screening device, and the '572 patent for an optional conveyor belt. With leave of the Court, plaintiffs amended their complaint to drop the allegations concerning the '000 patent and '572 patent.

Prior to trial, defendant moved for summary judgment on the charges of infringement and a related state law claim for unfair competition. The Court denied the motion for summary judgment on the ground that material issues of fact remained in dispute concerning the interpretation of the terms used in the patent claims.[11] Plaintiffs' claims of willful infringement of the '194 and '836 design patent were then tried to a jury.

Plaintiffs' case in chief consisted of testimony and exhibits offered to demonstrate the history of Read's invention, the prosecution of his patent applications, the manner in which his invention is expressed in the patents as issued, the manner in which Portec's devices infringe those patents literally or under the doctrine of equivalents, and the willfulness of Portec's actions in such infringing conduct. Defendant's case in chief consisted of testimony and evidence offered to demonstrate that the '194 patent was invalid due to anticipation and obviousness, that the '836 design patent was invalid because it was dictated by function rather than ornamentation, that Portec's devices did not infringe Read's patents literally or under the doctrine of equivalents, and that Portec could not have acted willfully because it had obtained and relied upon the opinions of legal counsel. Plaintiffs' rebuttal case focused on defendant's evidence concerning a screening device referred to as the "Hoehn" device. Portec had offered testimony on the Hoehn device as evidence of prior art which allegedly invalidated the '194 patent.

## II. DISCUSSION

### A. *Motion for JNOV*

#### 1. Infringement of the '194 Patent

■ Read charged Portec with literal infringement of claims two and seven of the '194 patent and also with infringement under the doctrine of equivalents. For literal infringement to be found, it is required that " 'the accused device embody every element of the claim.' " *Townsend Eng'g Co. v. Hitec Co.*, 829 F.2d 1086, 1090 (Fed. Cir.1987) (quoting *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 257 (Fed.Cir.1985). Infringement can also be found to exist under the doctrine of equivalents if every element of the

---

**9.** Drawings of a Portec two-footpad model are included in the Appendix.

**10.** The jury found that each of these models infringed both the '194 and the '836 patents.

**11.** As trial commenced, we considered defendant's motion in limine to preclude plaintiffs from pursuing the state law claim for unfair

competition. Finding that plaintiffs were asserting a claim of common law fraud under a nebulous tort theory, we granted defendant's motion and dismissed the state law claim of unfair competition because plaintiffs had failed to plead fraud with particularity and had failed to timely notify defendant of the nature of that claim.

accused device is found to perform substantially the same function, in substantially the same way, with substantially the same result as every element in the patent claim. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed. Cir.1989); *Pennwalt Corp. v. Durland–Wayland, Inc.*, 833 F.2d 931 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

■ The definition of the language of the "short end closed to the ground" element and the "set of wheels movable relative to said frame" element of the claims was submitted to the jury because material questions of fact existed to preclude summary judgment on these issues of claim interpretation and infringement.[12] As the Federal Circuit has summarized:

> In determining patent infringement, two inquiries are involved—(1) the scope of the claims and (2) whether the claimed invention has been infringed. The first inquiry, a determination of the scope of the claims, is a question of law. If the language of the claims is undisputed, the district court could interpret or construe the undisputed claims as a matter of law. If, however, the meaning of a term of art in the claims is disputed and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to a jury.

*McGill Inc. v. John Zink Co.*, 736 F.2d 666, 671–72 (Fed.Cir.) (citations omitted), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *accord Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). When the meaning of the language of a claim is at issue, it is proper to consult the prosecution history, the patent specification, other claims in the patent and the testimony of experts for evidence of the appropriate interpretation of that language. *See, e.g., General Elec. Co. v. Hoechst Celanese Corp.*, 698 F.Supp. 1181, 1187 (D.Del.1988); *see also DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 425 (Fed.Cir. 1986) ("The law presumes the jury made the findings necessary to support its verdict, and the required findings are controlled by the court's instructions to the jury.").

Portec argued throughout this litigation that its screening devices could not be found to infringe independent claims two and seven of the '194 patent, either literally or under the doctrine of equivalents, due to the doctrine of prosecution history estoppel. Portec contended that the two limitations added to these independent claims in the amendments by Read and the PTO Examiner estopped Read from successfully charging Portec with infringement of those two elements. As discussed above, these limitations consist of the following underlined language that appears in claims two and seven:

> A portable screening apparatus for separating coarse material from finer material comprising:
>
> a frame of generally rectangular cross section and having a tall end and a short end join[ed] by sides, *said short end being closed from an upper edge of said short end to the ground* and the lower portion of said tall end being completely open from the ground to a height sufficiently high to permit a payloader to collect the finer material from within the frame;
>
> . . . .
>
> *a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground;*

(DX 20, col. 5, lines 48–57, 63–67, col. 6, lines 13–22, 30–34).

---

12. Defendant's pretrial motion for summary judgment on the ground of no infringement was denied because we found that there existed as issues of fact in regard to the language used in the claims the questions of whether the short end of the Portec device, which ended approximately six inches above the ground, was "in essence closed to the ground" and whether extending the frame, instead of moving the wheels, fell within the description "wheels 'movable relative to said frame'." (D.I. 224 at 43–44)

Portec argues that the fact that there is a gap between the ground and the lower edge of the short end of Portec's devices demonstrates that those devices do not infringe the limitation in the '194 patent of "said short end being closed from an upper edge of said short end to the ground." Portec also argues that its devices do not infringe the '194 patent limitation that a device have "a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground."

Portec representatives conceded in the course of this litigation that its devices infringe all other elements disclosed in the independent claims of the '194 patent. In addition, we find that substantial evidence was presented to the jury upon which it could conclude that the Portec devices literally infringed all other elements disclosed in the independent claims of the '194 patent. (*See, e.g.*, Tr. 442–95, 1047–70). Therefore, if the jury could find that Portec's device infringed the "short end" element and the "wheels movable relative to the frame" element, the requirement that infringement be found for each element of a claim under literal infringement or under the doctrine of equivalents would have been satisfied.

■ Portec argues that these two claim limitations must be interpreted strictly, due to the doctrine of prosecution history estoppel. That doctrine applies both "to claim amendments to overcome rejections based on prior art, and to arguments submitted to obtain the patent." *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed. Cir.1983) (citation omitted). However, Portec's argument ignores the rule that a claim limitation is to be interpreted in view of the purpose of that limitation in the file history. As the *Hughes Aircraft* court stated:

> Some courts have expressed the view that virtually any amendment of the claims creates a "file wrapper estoppel" effective to bar all resort to the doctrine of equivalents, and to confine the pat-

entee "strictly to the letter of the limited claims granted." We, as has the Supreme Court, reject that view as a wooden application of estoppel, negating entirely the doctrine of equivalents and limiting determination of the infringement issue to consideration of *literal* infringement alone....

> Amendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of the amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. The effect may or may not be fatal to application of a range of equivalents broad enough to encompass a particular accused product. It is not fatal to the doctrine itself.

*Id.* at 1362–63 (emphasis in original) (citations omitted); *accord Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 987 (Fed.Cir.1989); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 1576 (Fed.Cir.1989); *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.,* 738 F.2d 1237, 1242–43 (Fed.Cir.1984).

2. The Short End Closed to the Ground

■ In view of the purpose, as stated by the Examiner, for the claim amendment, adding the short end limitation, we find that substantial evidence existed to support a jury finding of literal infringement of that claim language. The limitation of a short end "closed to the ground" was intended to define this element over the prior art. None of the prior art before the PTO Examiner included an enclosed short end with the barrier-dividing wall-structural functions of the Read design. As discussed above, the purpose of Read's short end being closed to the ground was to provide a dividing wall between the finer material deposited in the interior of the screening plant and the coarse material that piled up outside the short end. The

short end being closed to the ground also functioned as a barrier against which the payloader bucket could push to scoop material out from the interior. (DX 20, col. 4, lines 13–25; DX 7 at 32; Tr. at 850). In addition, the enclosing of the short end added sturdiness to the frame.

In view of the prosecution history of the purpose of this amendment, substantial evidence existed that the short end of the various Portec models literally infringed the short end of the device disclosed in the '194 patent. The short end of the Portec screening plants serves the same functions disclosed in the '194 patent. (*See, e.g.*, Tr. at 442–71, 1049–50). The six inch gap between the bottom of the Portec short end and the ground does not affect any of these functions, including the dividing wall function. In fact, Portec's outside counsel, Brett Valiquet, observed that, when the Portec screen system is in the operating position, "as the debris builds up at the short end, it "creates a natural barrier, preventing further debris from passing under the machine." (DX 234 at 2).

It is evident that complete closure to the ground is not necessary for the short end to perform the functions for which it is designed. Nor does the claim limitation require that the bottom of the short end actually touch the ground. The gap between the bottom edge of Portec's short end and the ground surface did not provide an escape from literal infringement. Evidence submitted to the jury demonstrated that this gap had no other apparent function than as an attempt by Portec to circumvent the '194 patent. (*See, e.g.*, PX 297L, at 60–61, 65–66, 258–61).

In the context of the prosecution history, these words are reasonably interpreted to mean that the short end is enclosed to such an extent that it can perform the barrier-dividing wall-structural functions that make it a distinctive element of the design disclosed in the '194 patent. *See, e.g., Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed.Cir. 1986) (claim term should be interpreted to be consistent with "inventor's purposes"), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98

L.Ed.2d 47 (1987). The prosecution history demonstrates that none of the prior art references included a short end that performed these functions in the manner disclosed in the '194 patent.

Moreover, such a finding would not involve a tortured interpretation of the words "closed to the ground." Portec argues that these words must be read to mean so completely closed to the surface of the ground that the bottom edge of the short end rests on the ground. Portec relies heavily in its arguments on the decision in *Senmed, Inc. v. Richard–Allan Medical Indus.*, 888 F.2d 815 (Fed.Cir.1989), in which the Federal Circuit focused on the dictionary definition of the word "on" in arriving at what the court viewed as a necessary legal conclusion regarding interpretation of the claim language in that case.

In the present case the crucial word is "to." In Webster's Third International Dictionary, the word "to" has the following primary definition: "used as a function word to indicate spatial relationships or relationships that suggest motion: as (a)— used as a function word to indicate movement or an action or condition suggestive of movement toward (1) a place, person or thing." Webster's Third International Dictionary 2401 (1971 ed.). This definition does not suggest that the preposition "to" must be defined as "on" rather than "in the direction of." Consequently, in addition to the functional role of the "short end closed to the ground," we have a dictionary definition which is consistent with an apparatus that has its short end either touching the ground or extending downward to a position near the ground. *Cf. Senmed*, 888 F.2d at 820 (discussing significance of difference between use of words "toward" and "on" in patent claim).

Finally, it is notable that Read utilized the term "completely" in the '194 claims when it was appropriate to express a requirement of his design. The '194 claims state that the tall end must be "completely open," since any obstruction by cross beams or other structural elements would interfere with the operation of the payload-

er which is so essential to Read's design. (DX 20, col. 5, lines 27, 54, col. 6, lines 19, 43; DX 7 at 27–36, 43–44; Tr. at 1264–68).

■ For the reasons discussed above, we find that substantial evidence existed for the jury to conclude that Portec's short end literally infringed the short end element of the '194 patent. Moreover, even if literal infringement is not present, there is abundant evidence to support infringement under the doctrine of equivalents. Portec's short end performs substantially the same function as the Read short end in creating a barrier for operation of the payloader, in dividing the piles of separated materials, and in supporting the frame. The Portec short end performs this function in substantially the same way by being closed in the direction of the ground so that it creates such a barrier, dividing wall and bracing member. The Portec short end performs this function with substantially the same result as the short end disclosed in the '194 patent. (*See, e.g.,* Tr. at 472–95, 1072–76, 1268–69; PX 297L, at 60–61, 65–66, 258–61).

■ Moreover, because the purpose of the amendment, adding the short end limitation, was not to avoid prior art which would be resurrected by allowing the equivalence of a short end barrier-dividing wall-structural element, whether it touched the ground or ended a short distance above the ground, the doctrine of prosecution history estoppel does not preclude claim interpretation permitting consideration of the doctrine of equivalents here.

> The relevant consideration ... is not whether the claims avoid the art but whether the accused [devices] are equivalents of the inventions set forth in the claims interpreted in light of the prior art.

*Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed.Cir.1983) (finding that the claim amendment did not relate to any disclosure in the prior art or elsewhere of the novel function of storage in a satellite of ground control command signals).

■ Furthermore, in considering infringement under the doctrine of equivalents, we must also keep in mind that a pioneer invention is entitled to a broad range of equivalents. *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532 (Fed.Cir.1987). *Sealed Air Corp. v. U.S. Intern. Trade Comm'n,* 645 F.2d 976, 984 (C.C.P.A.1981). The evidence presented in this case clearly demonstrated that the Read device was an innovation which differed in major respects from the traditional design and operation of screening plants. In particular the closed short end was a concept that in its dimensional compatibility with use by a payloader tractor and in its barrier and dividing wall functions was a departure from previously known components of screening plants. The "closed to the ground" short end element of the '194 patent is for that reason entitled to a liberal application of the doctrine of equivalents.

For the above reasons, we find that, even if the six inch gap between the bottom edge of the Portec unit and the ground should have been determined to be sufficient to prevent literal infringement, there was abundant evidence to support the jury's verdict of infringement under the doctrine of equivalents.

### 3. The Relationship of the Wheels and Frame

Turning to the element of a set of wheels "movable relative to said frame," we find that there is substantial evidence from which the jury could conclude that the Portec two-footpad and one-footpad models of its screening device literally infringed the '194 patent claims. (*See, e.g.,* Tr. 442–71, 863–66, 1052–58). We find even more convincing evidence that the Portec models infringed under the doctrine of equivalents. Moreover, the jury heard ample evidence to support a determination that file wrapper estoppel did not preclude Read from prevailing on this ground.

Read's original patent application did not include claim language concerning the relationship of the wheels to the frame. He added this language in the March 21, 1979, proposed amendments to the patent application. In remarks accompanying that pro-

posed amendment, Read's patent attorney made a number of observations concerning this element of the proposed amendment. He distinguished the wheel assembly element of the Read device from prior art references that included wheels, by pointing out that those prior art references placed the wheels in positions that would interfere with the operation of a payloader tractor as envisioned in Read's design. He also distinguished the wheel assembly element of the Read device from prior references that included wheels in positions that made transportability by towing far more difficult than was the case in the Read design.

Read's patent attorney also emphasized that an important characteristic of Read's device was its ability to do the heavy-scale separating traditionally performed by "grizzly" screening devices. To do this, Read believed that all of the weight of the frame and materials dumped onto the shaker screen should not be placed upon wheels attached to that frame:

> A further consideration is that in the order of 9,000 pounds of material may be dumped by the payloader onto the screening apparatus. If the apparatus were on wheels during use, all weight would be distributed to those wheels and failure would be likely. The cost of a sufficiently sturdy wheel arrangement would be prohibitive. Also, the apparatus would not be as stable on wheels as it is set flush on the ground. With respect to stability, it should also be noted that, by opening the tall end rather than a side or the short end, the screen can be kept close to the ground.

(DX 7 at 33). He observed that the Read device was distinguishable from the Deister prior art reference in part because "the wheels of the Deister apparatus are *not* collapsible. The apparatus would not be sufficiently stable or sturdy to withstand the heavy weights to which the device of the [Read] invention is subjected." (DX 7 at 35 (emphasis in original)).

The claim language itself expresses this importance of the transportability of the screening device on wheels, and of achiev-ing stability for operation of the screening device by distributing the weight of the device through the frame and not entirely through wheels attached to the frame: "a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground."

The '194 patent specification discloses that the relationship of the wheels and frame can be achieved by placing the wheels on hydraulic pivotal arms extending from the frame. When the pivotal arms are extended and secured, the wheels extend below the base of the frame and the screening device can be towed on the wheels. When the pivotal arms are retracted, the wheel assembly is moved relative to the frame so that the frame rests directly on the ground.

Portec attempted to avoid liability for infringement of this limitation by employing two large footpads connected one to each side of the frame and extendable by heavy hydraulic cylinders. The bottom of a footpad consisted of a heavy beam which was the same length as the base of the frame side into which it was connected. One foot pad was connected into the hitch side of the frame and the other into the opposite wheel side. The wheel assembly on Portec devices is affixed solidly to the side of the frame.

In order to rest the Portec frame on the ground, the two footpads are lowered until they come into contact with the ground. As the foot pads are then further extended, they lift the wheels off the ground and they support the weight of the machine, taking it off the wheels. To prepare the screening device for towing, the footpads are retracted, transferring the weight of the frame back to the wheels. (Tr. 454–55, 3476–82).

Plaintiffs' expert witness on engineering issues, Charles Powell, testified at trial that the Portec footpads constituted extensions of the frame and not merely a form of lift "jacks." Read, who qualified as an expert witness concerning such equipment, testified similarly. These footpads are the

same length as the side walls of the Portec frame, rather than the more inconsequential dimensions of a lift jack. They are extended down from or retracted back into the frame by the use of two heavy-gauged, hydraulic cylinders aligned adjacent to one another. (Tr. 1054–58, 1265–66, 1274–76, 3678–80).

■ The relationship of Portec's footpads to the frame and to the wheels was functionally similar to the relationship of the frame and wheels described in the independent claims and specification of the '194 patent. Portec argued that the footpads could not be viewed as a part of the frame. However, we find that substantial evidence existed to support a jury's conclusion that these footpads were part of the frame of the Portec devices. Thus, with their two footpads extended, the frame of the Portec devices rested "flush on the ground" in the same manner as described in the '194 patent specification.

From the operation of the Portec models, as described above, we find that substantial evidence existed for the jury to conclude that infringement of the "wheels movable relative to the frame" element existed under the doctrine of equivalents. In the patent claim and in the accused device there are a set of wheels and a frame. The wheels move relative to the frame to perform substantially the same function, i.e., to transfer the weight of the screening plant from the frame to the wheels for transport and from the wheels to the frame for operation. Moreover, the same result is achieved, the frame absorbs the weight when the plant is screening and the wheels carry the weight when the plant is being towed. (*See, e.g.,* Tr. at 472–95, 1052–58, 1077–80). The operation of the Read Screen–All in having its wheels move and of the Portec devices in having the frame move, by extending the foot pads, both fall within the claim language "a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground." *Cf. Corning Glass Works v. Sumitomo Elec. U.S.A.,*

*Inc.,* 868 F.2d 1251, 1259–60 (Fed.Cir.1989) (in optical waveguide fibers, to create the refractive index differential between the core and cladding of the fiber which is necessary for the fiber to function as an optical waveguide, substituting a negative dopant in the cladding is equivalent to using a positive dopant in the core). The fact that the Portec frame extended to create the movement of the frame in relation to the wheels rather than the wheels being moved relative to the frame by retracting the wheels as in the Read design, does not preclude the application of the doctrine of equivalents. Indeed, it exemplifies the reason for which the doctrine was created.

During the course of this litigation, customers of Portec discovered that they could operate their two-footpad models by extending the hitch-side footpad to the ground, while leaving the wheel-side footpad raised up. As a result, part of the weight of the frame and of the material being screened was borne by the wheels during operation. When Portec's counsel and executives learned of this, they decided to produce models of the Portec device with only one footpad located on the hitch-side of the apparatus. Portec argues that its development of a one-footpad model further distinguished its own design from that disclosed in the '194 patent claims.

Plaintiffs contend that the evidence presented at trial demonstrated that the relationship between the wheels and frame, as disclosed in the '194 patent, should be interpreted as addressing the transportability of the screening apparatus. Moreover, other evidence presented at trial indicated, as to both the one and two-footpad models, that during operation of the Portec screening device, material would pile up around the base of the frame and become compacted beneath the frame walls, thus supporting the weight of the frame. We find that, even as to the one-footpad model, substantial evidence was presented at trial from which the jury could find infringement of the '194 patent under the doctrine of equivalents. (Tr. at 472–95, 1061–64, 1077–83, 3476–82). As discussed above, substantial evidence existed from which the jury could conclude that the footpad was part of the

Portec frame and that it moved relative to the wheels of the device. In addition, substantial evidence was presented at trial which called for interpreting the '194 claim language in such a manner that it would literally disclose, or be embodied in, a screening apparatus that placed part of the weight of the screening device on the wheels while that device was in use.

Portec argues that the remarks that accompanied Read's March 21, 1979, proposed amendments demonstrate that Read did not intend the wheel assembly to bear any weight when the screening device was in operation. However, we note that the claim language itself does not explicitly address a concern for the degree of weight placed upon the wheel assembly when the screening device is in use. The remarks accompanying the March 21, 1979, amendment indicated only that "failure" of the wheels "would be likely" if *"all* weight" were distributed to those wheels. (DX 7 at 33 (emphasis added)). In those remarks, Read distinguished his design from that disclosed in the Deister prior art reference, by focusing on the fact that Deister discloses a design in which all weight is distributed to wheels affixed to the frame of the device.[13] (PX 4). Accordingly, we do not find that Portec's argument carries persuasive force.

The above discussion demonstrates that the jury heard substantial evidence to support a finding of infringement under the doctrine of equivalents, i.e., that the one-footpad models also performed the same function of transportability with the use of wheels connected to one side of the frame and performed this function in substantially the same way and with substantially the same result as disclosed in the '194 patent claim language. By extending the single footpad to transfer a portion of the weight to the frame, the one-footpad models also performed substantially the same function of creating stability and durability of the apparatus during operation of the device as is disclosed in the patent claim language,

specification and prosecution history. The one-footpad models perform this function in substantially the same way, and with substantially the same result, as is disclosed in the claim language, even though the Portec model distributes only part of the weight to the frame and leaves a portion of the weight on the wheels.

■ Such a conclusion by the jury would not constitute a finding unsustainable at law. Although it is a rule of law that "prosecution history estoppel will not allow the patentee to recapture through equivalence certain coverage given up during prosecution," *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870 (Fed.Cir.1985), such estoppel must be analyzed in view of the purposes for which the specific amendments were added to a patent claim. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362–63 (Fed.Cir.1983). The purpose of the amendment concerning the relationship of the wheels and the frame in the '194 patent was to point out the dramatic departure Read's design had taken from the prior art in terms of transportability and the design of a compact screening plant that was durable enough to perform the functions of both grizzly and dinosaur devices. To hold that Portec's one-footpad model infringed this claim language under the doctrine of equivalents would not involve a recapture of subject matter surrendered by Read in the prosecution of his patent application.

■ Finally, Portec listed as one of the grounds for its motion for JNOV that no substantial evidence existed upon which the jury could conclude that the '194 patent was not invalid due to anticipation or obviousness. However, in its briefs in support of its motion, Portec provided no argument in support of this contention. A patent is presumed valid until proven otherwise. 35 U.S.C. § 282. Defendant bore the burden at trial of proving the '194 patent invalid. We find that substantial evidence was

---

**13.** Read testified at trial concerning the device disclosed in the Deister patent that: "It is some kind of a device that I would imagine would be hand-fed. It looks like an oversized wheelbar-row, these big wheels. It dates back to 1931. So [mechanized] loaders weren't around at that point." (Tr. at 350).

presented at trial upon which the jury could conclude that it was appropriate to reject contentions by the defendant that the '194 patent was invalid. Moreover, as discussed above, plaintiffs presented extensive evidence demonstrating validity, including the dramatic departure that Read's screening device represented over the prior art.

### 4. Infringement and Validity of '836 Patent

Portec contends in its motion for JNOV that the court must overturn the jury verdict finding the '836 design patent valid and infringed. Portec argues that the '836 design patent is invalid because it is primarily functional rather than ornamental.[14] It also contends that no viable evidence was presented at trial from which the jury could conclude that the Portec screening devices infringed the '836 patent. For the reasons discussed below, we reject these arguments.

As is the case in design patents, the '836 patent includes a single claim stating simply that it exhibits "[t]he ornamental design for a portable screening plant, as shown and described" in eleven figures (illustrations) set forth in the patent. *See, e.g., In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir.1988) ("Design patents have almost no scope. The claim at bar, as in all design cases, is limited to what is shown in the application drawings."). A design patent may be obtained pursuant to 35 U.S.C. § 171 on "the design of an article of manufacture which is 'new, original and ornamental' and 'nonobvious' within the meaning" of 35 U.S.C. § 103, "which is incorporated by reference into section 171." *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed.Cir.1988) (quoting 35 U.S.C. § 171). Thus, "[w]hen function dictates a design, protection would not promote the decorative arts, a purpose of the design statute." *Id.* at 1563.

The jury was instructed on the traditional *Gorham* test for infringement of a design patent:

> "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."

*Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1187 (Fed.Cir.1988) (quoting *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1872)). The evidence available to support the jury's finding of infringement of the '836 patent included testimony by Read as to the similarity of the Portec devices to the design depicted in the '836 patent illustrations. (Tr. at 556–65). We cannot find that no substantial evidence existed upon which the jury could conclude that the Portec devices infringed the '836 patent. Nor is it our role to usurp the jury's function of weighing that evidence or the credibility of the witnesses who presented it.

Portec's primary argument is that the '836 patent must be held invalid as a matter of law because it was primarily functional rather than ornamental. *See, e.g., Avia*, 853 F.2d at 1563 ("[I]f a patented design is 'primarily functional,' rather than 'primarily ornamental,' the patent is invalid."). However, this does not mean that a utilitarian object cannot also be the subject of a design patent.

> [A] distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture, or to obtain both design and utility patents on the same article.

*Id.* (citations omitted). We do not deny that the Read device performed a function. Nevertheless, its overall design was a

---

**14.** Portec's motion for JNOV also listed as a ground for the motion that the '836 design patent was publicly disclosed more than one year before that application for the patent was filed.

However, Portec provided no argument in support of this contention in its briefs, and we find no basis upon which to grant its motion on that ground.

choice made by the inventor who could have arranged the functioning parts in other, different designs. It is the "overall aesthetics of the various components and the way that they are combined" which constitute the "design" and which validly may be patented. *Id.* (quoting the district court, *Pensa, Inc. v. L.A. Gear of California, Inc.*, 4 USPQ 2d 1016, 1019 (C.D.Cal. 1987)). Indeed, it was on the basis of the *Avia* court's holding that we had denied defendant's earlier motion for summary judgment on the validity of the '836 patent.

The *Avia* court quoted with approval the following observation by the district court in that case: "If the functional aspect or purpose [of a feature of the patented subject matter] could be accomplished in many other ways [than that] involved in this very design, that fact is enough to destroy the claim that this design is primarily functional." *Id.* The jury in the present litigation received instructions on these rules of law concerning the validity of design patents.

Portec contends, however, that certain testimony by Read established an admission that the design exhibited in the '836 patent is dictated primarily by functional concerns. Plaintiffs respond that Portec has simply taken isolated comments out of the context of surrounding testimony. They point to other testimony by Read in which he indicated his belief that the design was ornamental in nature.

For these reasons, we must reject Portec's motions in regard to infringement and validity of the '836 patent. We can find neither a conclusion wholly contrary to the law nor unsupported by substantial evidence.

### 5. Willful Infringement

■ Portec argues that no substantial evidence exists to support the jury's findings that Portec infringed the '194 and '836 patents willfully. In view of the facts discussed above concerning Portec's course of conduct in creating its own version of the Read Screen–All, the conflicting legal opinions it received, and the doubtful nature of its reliance on those legal opinions, and also for the reasons discussed in our May 25,

1990, Memorandum Opinion, awarding treble damages, attorneys' fees and expenses, we disagree. We find that substantial evidence was presented at trial from which the jury could conclude that Portec acted willfully. For this same reason, we will not reconsider our May 25 decision, awarding treble damages, attorneys' fees, and expenses.

### 6. Lost Profits Damages

Portec's next argument in its motion for JNOV or a new trial is that there existed no substantial evidence to support the jury's verdict for lost profits damages. At the conclusion of the trial, the Court instructed the jury on the elements of proof for finding lost profits damages in accordance with the holding in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir.1978). The *Panduit* court stated:

> To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

*Id.* Portec contends that the plaintiffs failed entirely to satisfy the second of these elements.

■ Portec argues that the testimony at trial established persuasively that numerous substitutes for the Read screening device existed in addition to the Portec devices. Portec's argument is based on an assumption that a broad product market for screening devices should be used as the measure for whether substitutes existed. However, the principle is well established that one is to evaluate the existence of "acceptable" substitutes. If the patented product falls within a particular submarket or market niche, it is to that submarket alone that one looks for substitutes. *See, e.g., TMW Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed.Cir.) ("Mere existence of a competing device does not make that

device an acceptable substitute. The special master committed no error in noting that none of the alleged substitutes had all beneficial characteristics of the patented device."), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986); *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 276 (Fed.Cir.1985) (patented device fitting in "special niche" of larger product market has acceptable substitutes only within that niche).

 We find that substantial evidence was presented at trial from which the jury could conclude that the Read device represented a dramatic departure from traditional screening devices; that it was particularly suited to a one-man, one-machine operation, being used in the clearing of a relatively small area, as opposed to an extensive excavation for an airport or shopping center; and that the Read and Portec screening devices therefore occupied a submarket within the larger general market of screening devices. (*See, e.g.,* Tr. at 585–86, 1445–47, 3395–401, 3407–11; PX 214, 231, 231A). Similarly, the jury could conclude on the evidence presented at trial that the Read and Portec devices were the only devices occupying such a submarket and that, as such, if Portec had not made a particular sale, Read would have. *See, e.g., Marsh–McBirney, Inc. v. Montedoro–Whitney Corp.*, 882 F.2d 498, 505 (Fed.Cir. 1989) ("[W]hen the contesting parties are the only suppliers of the product, it is not inappropriate to infer that the patentee would have had the sales made by the infringers."). We will not, therefore, grant either JNOV or a new trial on this ground.

### B. *Motion for New Trial*

Portec's motion for a new trial, pursuant to Federal Rule of Civil Procedure 59, is made in the alternative to its JNOV motion and is based in part on the same arguments made on the motion for JNOV. Portec contends the verdict was in all respects clearly contrary to the weight of the evidence and that a miscarriage of justice will result if the verdict is permitted to stand. For the reasons discussed in denying each ground of Portec's motion for JNOV, we

also deny Portec's motion for a new trial. As we have noted, we have found substantial evidence to support the jury verdict in all the aspects Portec has cited.

 In its motion for a new trial, Portec also challenges a number of judicial rulings. For the reasons set forth below, we will reject each of Portec's arguments. Portec first contends that the Court committed prejudicial error by refusing to permit Portec to introduce surrebuttal evidence on the topic of the Hoehn screening device. It has been long established that surrebuttal evidence is permissible only when the other party has introduced evidence concerning an entirely new subject matter in its rebuttal case at trial. *See, e.g., Chateaugay Ore & Iron Co. v. Blake*, 144 U.S. 476, 484–85, 12 S.Ct. 731, 732–33, 36 L.Ed. 510 (1892).

 Portec introduced an array of evidence about the Hoehn screening device in its case in chief for the defense, including the testimony of three individuals, involved in its construction and operation, and photographs of the device. Plaintiffs' rebuttal case consisted of an examination of the details of the evidence concerning the Hoehn screening device, particularly a magnified examination of one of the photographs. Because this evidence was originally admitted into the record as a part of Portec's case in chief, no new subject matter was introduced in plaintiffs' rebuttal case which would warrant an opportunity for surrebuttal by Portec. Moreover, Portec's proffer of the surrebuttal evidence it wished to introduce consisted of further testimony from the witnesses who had already testified in Portec's case in chief. Under such circumstances, denial of a request for surrebuttal is appropriate. *See, e.g., Zurich v. Wehr*, 163 F.2d 791, 793 (3d Cir.1947).

 Portec next contends that the Court committed prejudicial error in its decision to exclude evidence from the trial concerning two other patents owned by plaintiffs: the '000 patent, for the center plate used in plaintiffs' screening device, and the '572 patent, for an optional convey-

or assembly. The Court granted plaintiffs' motion in limine to exclude this evidence on the ground that the plaintiffs were not asserting any claims concerning these patents in their amended complaint, and that such evidence therefore was irrelevant to the disputes concerning the '194 and '836 patents.

After considering the parties arguments on plaintiffs' motion, we found that the plaintiffs' inclusion of the '000 and '572 patents in their original claim was due to "adjustments or [add]itions made to an apparatus that remained" on that apparatus when observed by plaintiffs, and that these adjustments were undertaken "not by the defendant but by the owner or user of the apparatus." (Tr. at 25). We concluded that the "original inclusion of these patents in the complaint is not any indication of a lack of due diligence" in the plaintiffs' drawing up of the complaint. (*Id.*)

We find no error in these conclusions and are not persuaded by Portec's cursory argument that evidence concerning the '000 and '572 patents was relevant to Portec's alleged infringement of the '194 and '836 patents. Each of these patents addresses a subject matter distinct from the others. A party could willfully infringe one or two of these patents without infringing the others by accident or choice. Nor does the fact that two patents are not infringed by defendant have bearing on the question of whether defendant does infringe two other patents.

Next, Portec contends that the Court committed prejudicial error in rejecting Portec's proposed jury instruction number 18, and in failing to adequately instruct the jury on the correct meaning and interpretation of critical elements in claims 2 and 7 of the '194 patent in light of the prosecution history of those claims. Portec argues that claim interpretation is an issue of law which must be decided by the Court. It therefore contends that its proposed jury

instruction 18 was correct, because it would have instructed the jury that it must interpret "closed to the ground" as meaning the frame of the screening apparatus, including the short end, rested flush on the ground, and that it must interpret "a set of wheels mounted to one of said sides and movable relative to said frame" as meaning "collapsible wheels." The jury would then have been bound to follow that instruction in deciding whether there was infringement.

■ This argument is not persuasive. Portec simply ignores a number of holdings by the Federal Circuit to the effect that the issues of claim construction should be submitted to a jury when there are disputed material issues of fact concerning the correct interpretation of the patent claim language and the related scope of those claims. *See, e.g., McGill,* 736 F.2d at 671–72 (quoted above with citations in accord). We denied Portec's pre-trial motion for summary judgment, in which Portec asserted that claims 2 and 7 must be interpreted in the same way as proposed in jury instruction number 18, because we found that there were issues of fact as to just how the claim language should be interpreted. Having determined that this issue was one for consideration by the jury, we rejected defendants' proposed instruction number 18 and we instructed the jury to interpret the disputed language. The construction that the jury then gave to this language is evidenced by its verdict.

■ Finally, Portec contends that the Court committed prejudicial error by rejecting Portec's proposed jury instruction number 36 concerning damages for lost profits. The only specific argument Portec provides to support this contention is that the Court's jury instruction on lost profits damages stated that the jury "should" consider the *Panduit* elements of proof that the Court recited in its instruction.[15] Portec

---

15. The instruction given to the jury on this point read as follows:

In order to recover for lost profits, Read must show by a preponderance of the evidence that, but for the infringement, it would have had a reasonable probability of making Portec's sales. In determining the amount of lost profits, you should consider the demand for the patented product in the market, the presence or absence of acceptable non-infringing substitutes and the production and marketing capacity of Read.

argues that the Court should have stated that the jury "must" consider those elements. We find such syntactic quibbling unpersuasive as a basis for a motion for a new trial and as a contention of prejudicial error. *Cf. Yarway,* 775 F.2d at 275 ("It is well settled that proof of lost profits need not be absolute but may not be speculative; lost profits must be proven to a reasonable probability.").

### III. CONCLUSION

For the reasons discussed above, defendant's motion both for JNOV and for a new trial will be denied.

An appropriate order will issue.

Des. 263,836

*Fig. 1*

*Fig. 6*

4,197,194

Fig.4

*Fig. 6*

4,197,194

MARCOUX

A. C. HAFFNER

PORTABLE OSCILLATING ROCK SEPARATOR

Fig-1

H. L. STRUBE

VIBRATING SCREEN

Filed April 23, 1940

Fig.1.

1108

E. DEISTER

SCREEN

Filed Nov. 19, 1926

*Fig. 1.*

*Fig. 2.*

*Fig. 3.*

M. W. CLARK ET AL

EJECTOR FOR LOADER BUCKETS

Fig-1-

PORTEC

PORTEC

PORTEC